D. Victoria Baranetsky (Cal. Bar No. 311892)
THE CENTER FOR INVESTIGATIVE REPORTING
1400 65th St., Suite 200
Emeryville, CA 94608
vbaranetsky@revealnews.org
Telephone: (510) 982-2890

Attorney for Plaintiff

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING,<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF LABOR,<br><br>Defendant. | Case No. 19-CV-05603-SK<br><br>**DECLARATION OF PROFESSOR SHARON K. SANDEEN IN SUPPORT OF OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND CROSS MOTION FOR SUMMARY JUDGMENT** |

I, SHARON K. SANDEEN, declare:

1. I, Sharon K. Sandeen, have personal knowledge of the matters stated in this declaration and have no personal or pecuniary interest in the outcome of this case. If called upon to do so, I am competent to testify to all matters set forth herein.

2. I am a Professor of Law and the Director of the IP Institute at Mitchell Hamline School of Law in St. Paul, Minnesota where my teaching and scholarship focuses on intellectual property and information law, with an emphasis on trade secret law. I have degrees from the University of California Berkeley (BA), the University of the Pacific, McGeorge School of Law (JD), and U.C. Berkeley School of Law (LLM).

3. From 1985 until 2002, I practiced law in Sacramento, California as a business litigator. In the early 1990s, I served on the Executive Committee of the Intellectual Property Section of the State Bar of California and was invited to contribute to a comprehensive update of the Continuing Education of the Bar's (CEB's) publication on trade secret law. In recognition of my professional accomplishments, I was elected to membership in the American Law Institute and am as life-member of the American Bar Foundation. I was also awarded the Fulbright-Hanken Distinguished Chair in Business and Economics for 2019-20.

4. Since becoming a law professor, I have written scores of books, book chapters, and law review articles on intellectual property, information, and trade secret law topics, including the first casebook on trade secret law, *Cases and Materials on Trade Secret Law*.

5. In 2008 and 2009, I collected hundreds of pages of source documents from both the American Bar Association and the National Conference of Commissioners of Uniform State Laws (NCCUSL; now known as the Uniform Law Commission (ULC)) so I could write a detailed and comprehensive history of trade secret law, including the impetus behind the adoption of and wording of the Uniform Trade Secrets Act (UTSA). I have also conducted extensive research into the history of the *Restatement (First) of Torts* provisions on trade secret law (Sections 757-759), including an examination of source documents in

- -
Sandeen Decl. in Supp. of
Opp. & Cross Mot. Summ. J

1

the archives of the American Law Institute.

6. In this "Information Age," many companies, particularly those that collect massive amounts of data from customers, are quick to assert ownership of the data and information they collect and create, often claiming property rights therein. But the laws of the United States are limited in the protection they afford to information and data. Moreover, when information is protected by U.S. law, it is only protected to the extent provided by applicable law; protection that is usually limited, both substantively and procedurally, by the public interest. An obvious example of this is provided in the Federal Rules of Civil Procedure which require federal courts to weigh the relevance of information against assertions of privacy and secrecy. Significantly, that body of law requires a showing of some detriment to the subject of the information before the discovery or use of the information will be denied or a Protective Order issued.

7. As a practical matter, except where information is relevant in litigation, must be shared to obtain value, or is required to be disclosed for regulatory purposes, information can always be kept secret through self-help measures. But information is not protected by the law unless a statute or common law principle says it is, and a common feature of U.S. information law is to require proof of actual or threatened harm before any remedy for the misappropriation of information will be allowed. Thus, information that is "secret" or "confidential" in the minds of information owners/holders is not co-extensive with the scope of information that is protected by law. Rather, protectable information has a legal definition that is often inconsistent with common dictionary or business definitions.

8. Based on my academic research, legal protection for information is limited based on the human, commercial, and public need for information and knowledge. In general, information diffusion promotes the important value of free competition by allowing public information to be reused, including as the basis for follow-on invention and creativity.

9. The United States' default rule of information diffusion can be seen in numerous legal principles which, collectively, demonstrate the value and importance of

information in everyday life. This includes, for instance: (1) the IP Clause of the US Constitution and the limited scope of IP laws adopted pursuant to its authority including, for instance, the fair use limitation on the scope of copyright protection; (2) the First Amendment to the US Constitution and related jurisprudence that promotes access to information; (3) numerous case decisions that recognize the public's right to information once it is publicly disclosed or simply "blurted out"; and (4) FOIA, which is the focus of the subject litigation.

10. U.S. patent law protects information to a degree by prohibiting certain uses of information about inventions that is disclosed in an issued patent. Copyright law only provides protection for information to the extent that it constitutes "an original work of authorship fixed in tangible form." Facts and ideas, once disclosed in a publicly distributed work of authorship, are not protected by copyright law. Thus, unless the limited protection for information provided by patent and copyright law applies, the principal means for protecting information in the United States is through contract and trade secret law, but both means of protection also have limits.

11. The principal limitation of contract law is the rule of privity, while trade secret law only provides protection for a defined sub-set of "secret" information. There is no law or legal principle in the U.S. that provides a private cause of action to protect a "broad category of documents" that individuals and businesses themselves classify as "confidential information." Neither contract law nor trade secret law can be utilized to protect information that is already available to the public (i.e., generally known of readily ascertainable as defined below) and, for this reason, contractual obligations cannot create a trade secret; they can only obligate someone to protect the secrecy of information that otherwise meets the definition of a trade secret.

12. Consistent with principles of information diffusion, information that has been disclosed to the public, even if it was once protected by law, loses its protection unless principles of patent or copyright law apply to protect it. As Justice Brandeis famously stated: "The general rule of law is, that the noblest of human productions--knowledge,

truths ascertained, conceptions, and ideas--become, after voluntary communication to others, free as the air to common use." *Int'l News Serv. v. Associated Press*, 248 U.S. 215, 250 (1918) (Brandeis, J., dissenting).

13. A "disclosure" that waives applicable information protection can occur in the following ways: (a) a voluntary disclosure of the information by the information owner, including by sharing the information with others (including the government) without an obligation of confidentiality first being established; (b) an inadvertent disclosure of the information by the information owner, for instance, by failing to engage in reasonable efforts to maintain its secrecy; (c) when the information is reversed engineered or independently discovered or developed by another and subsequently disclosed; and (d) when information is misappropriated by another and subsequently disclosed.

14. The meaning of "public disclosure" under U.S. law is broader than the commonly understood definition (or a dictionary definition) because it does not require widespread dissemination to the public at large. Rather, under the definition of protectable information that existed at the time FOIA was adopted in 1966, information is not protectable if it is "generally known" or "readily ascertainable."

15. Some types of information, like information collected from customers or gleaned from publicly available records, while maintained by a company "in confidence," is not deemed "secret" or "confidential" for legal purposes because it is readily ascertainable from like sources. This is why, for instance, many customer lists and other types of factual reports often do not qualify for protection; Typically, they reflect information that: (a) is in the possession of others (e.g., customers) and therefore not secret or confidential; or (b) could be readily ascertained.

16. Consistent with the public's interest in information diffusion, FOIA states that government transparency and information sharing concerning government activities are the rule and that the exemptions specified in FOIA are the exceptions. 5 U.S.C. §§ 552(a)-(b). Thus, it is in the context of the strong U.S. public policy that favors information diffusion that the meaning of "trade secrets and commercial or financial information" in Exemption

4, 5 U.S.C. § 552(b)(4), must be understood and narrowly construed.

17. While seemingly a limitation on the scope of government transparency required by FOIA, the legislative history of Exemption 4 reveals that it was actually intended to have the effect of restricting the then-existing ability and discretion of governmental agencies to promise confidentiality and refuse to disclose information that they deemed "confidential." Now, FOIA sets the limit on which government-held information can be withheld from disclosure unless some other law adopted by Congress further prohibits (or allows) disclosure.

18. Hearings regarding FOIA held in May of 1965 are replete with testimony of representatives of governmental entities expressing concern about how FOIA would require them to disclose information that had previously been withheld from public disclosure, including that of the Interstate Commerce Commission that expressed concerns that the disclosure of accident reports required to be filed by railroad companies might lead to more personal injury claims. *Administrative Procedures Act: Hearings before the S. Subcomm. on Administrative Practice and Procedure of the S. Comm. on the Judiciary*, 89th Cong. (1965).

19. FOIA does not prohibit Congress or federal government agencies from deciding as a matter of policy (reflected in a statute or regulation) that information that might otherwise be exempt from disclosure under FOIA should be disclosed. Often regulated companies are required to waive whatever secrecy or confidentiality might exist in information they are required to submit as a cost of doing business. U.S. patent law is just one example. Indeed, such a policy is consistent with the government transparency goals of FOIA.

20. Federal government agencies have at least two other reasons why they often require the disclosure by regulated companies of information that the companies deem "confidential." First, there is a need to limit the sorts of information that can subject federal government employees to criminal prosecution under the federal Trade Secrets Act. 18 U.S.C. § 1905. This is particularly true where the information that a company labels as

"confidential" does not meet any legal definition of protected information because of the due process concerns that a lack of adequate notice raises. Second, federal government agencies have an interest in preventing the creation of "investment-backed expectations of confidentiality," lest they subject the federal government to a claim under the Takings Clause of the U.S. Constitution. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984).

21. Exemption 4 of FOIA, whether considered as of 2020 or when FOIA was adopted in 1966, clearly directs that not all confidential information, or even all confidential business information, is exempt from disclosure under FOIA. Instead, only information that is either a "trade secret" or is "commercial or financial information obtained from a person that is privileged or confidential" is exempt. But FOIA does not define what is meant by the terms "trade secret," "commercial," "financial information," "privileged" or "confidential," leaving it up to federal courts to provide meaning as guided by federal principles of statutory interpretation and interstitial lawmaking.

22. In 1966 and under current law, including the Defend Trade Secrets Act of 2016, the definition of a trade secret is clear. There are three requirements. First, the information must be secret because it is not generally known of readily ascertainable. Second, the information must have "independent economic value" to others because of its secrecy. Third, the information must have been the subject of reasonable efforts to maintain its secrecy; Doing nothing, even if the information remains factually secret, is not enough.

23. While the DTSA's definition of a trade secret (and the Uniform Trade Secrets Act ("UTSA") definition upon which it is based) was not in effect in 1966 when FOIA was adopted, such definition is largely consistent with the then existing common law definition of a trade secret as set forth in the *Restatement of (First) of Torts*, section 757-59. The principal differences are: (1) the six-factor test of the *Restatement* has been replaced with three specific requirements which incorporate all of the *Restatement* factors except for what I call the "sweat-of-the-brow factor;" (2) prior to the UTSA, trade secret law required that the subject information be continuously used in one's business; and (3) the limited protection specified in section 759 for information not meeting the definition of a trade

secret (typically, confidential business information that is ephemeral and not "in continuous use") was eliminated.

24. Whether applying the UTSA, DTSA, or *Restatement* definitions of a trade secret, to be a trade secret information must give its owner/possessor a competitive advantage over others that is related to its secrecy. *See* Rest. (First) of Torts, § 757, cmt. b. This is due, in large part, to the harm requirement of tort law; The use of trade secrets or confidential business information in one's business or its independent economic value is evidence of the required cognizable harm.

25. Consistent with the concept that not all confidential information qualifies for trade secret protection, the inherent or internal value of information to its owner/possessor is irrelevant for trade secret purposes. Instead, the critical question is whether others can obtain a competitive benefit from the putative trade secrets. In other words, a causal link is needed between the competitive advantage that the business owner gains from the fact that the subject information is confidential (as defined by trade secret law) and the defendant's threatened or actual use of the alleged secrets.

26. While trade secret law is not FOIA law, it should inform the test for what qualifies as "confidential business information" under Exemption 4 of FOIA.

27. Given the definition of a trade secret, even in 1966, one should wonder why Congress chose to add the language "commercial or financial information that is privileged or confidential" to FOIA Exemption 4. I believe it is because, in 1966, many people (and cases) used the "trade secret" moniker to connote confidential technical and scientific information and the label "confidential" to refer to other types of information that were kept secret. Also, as previously noted, the common law definition of a trade secret required the information to be "in continuous use," which excluded a lot of confidential business information from trade secret protection, and Congress wanted FOIA to exempt a broader set of confidential information. Over time, and consistent with the drafting history of the UTSA, which repeatedly noted the need for one "unitary" definition of protectable information, the definition of trade secrets as secret technical and scientific information and

the definition of other confidential business information were merged into the UTSA's definition of a trade secret.

28. The desire for a single, unitary definition of protectable "secret or confidential" information is why Section 7 of the UTSA was included to expressly preclude all other tort claims for the misappropriation of competitively significant information. Thus, under the UTSA (and now the DTSA), secret and confidential information is not protected under U.S. law unless it: (1) is a trade secret; (2) is non-public information that must be kept confidential pursuant to an enforceable contract; or (3) is the subject of what FOIA denotes as a "privilege," but that I call an obligation of confidentiality imposed by law.

29. Prior to the adoption of the UTSA, the *Restatement (First) of Torts* recognized limited protection for information not meeting the definition of a trade secret which, in FOIA Exemption 4 parlance, might include "confidential commercial or financial information" that does not qualify for trade secret protection. *See Restatement (First) of Torts*, Section 759. However, the available protection only applied in cases where the information owner could prove that the information was "acquired by improper means" by another "for the purpose of advancing a rival business interest." Additionally, sections 757-59 of the *Restatement (First) of Torts* required the information to be secret or confidential and relate to the information owner's business.

30. Information was not a trade secret or confidential at common law if it was disclosed by the holder (or purported owner) of the information to others (including governmental agencies) voluntarily or inadvertently before an enforceable obligation of confidentiality was established. In other words, the status of information as factually "secret" or "confidential" does not equate with the legal meaning of secrecy and confidentiality, and this was true in 1966 when FOIA was adopted. This principle is shown most clearly by the trade secret requirement that information must be the subject of reasonable efforts to maintain its secrecy, even if it is otherwise secret. Without such a requirement, and the related need for an obligation of confidentiality, the recipient of

information would not know of the possible legal obligations that attach to the information, including possible criminal sanctions.

31. In the context of information submitted to the government, particularly as part of a regulatory scheme, often no duty of confidentiality applies to the information for three reasons: (1) the subject information does not meet the definition of information that is exempt from disclosure under FOIA; (2) the governmental entity made no promise of confidentiality with respect to such information, often because the public policy of government transparency or information disclosure—*see, e.g.*, U.S. patent law—was deemed more important than any private interest in confidentiality, but also because to do so might create an "investment-backed expectation" of confidentiality that could be the basis of a claim under the Takings Clause of the U.S. Constitution; and (3) even in situations where governmental agencies can and do make a promise of confidentiality consistent with FOIA, the subject regulation often defines the information that is subject to a confidentiality obligation and requires the submitter to mark (or label) the information with an appropriate legend so that the purported trade secret or confidential information can be distinguished from other submitted information. *See, e.g.*, OSHA rules requiring proper markings, 29 C.F.R. § 70.26.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct to the best of my knowledge and belief.

Executed April 23, 2020 in Saint Paul, MN.

/s/ *Sharon K. Sandeen*
Professor Sharon K. Sandeen